## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS )
301 N. Guadalupe St., Suite 201 )
Santa Fe, NM 87501 )
)
      Plaintiff, )
)
  vs. )
)
DOUG BURGUM, in his official capacity as Secretary of )
the U.S. Department of the Interior, )
1849 C Street, N.W. )
Washington, D.C. 20240, )
)  Civil Action No. 1:25-cv-452
PAUL SOUZA, in his official capacity as Acting Director of )
the United States Fish and Wildlife Service, )
1849 C Street, N.W. )
Washington, D.C. 20240, )
)
      *and* )
)
UNITED STATES FISH AND WILDLIFE SERVICE, )
1849 C Street, N.W. )
Washington, D.C. 20240 )
)
      Defendants. )
)

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     This case challenges the U.S. Fish & Wildlife Service's ("Service") decision not to list

three plant species, Cisco milkvetch (*Astragalus sabulosus*), stage station milkvetch (*A. vehiculus*), and

Isely's milkvetch (*A. iselyi*), a.k.a. the "Moab-3," as either endangered or threatened under the Endangered Species Act ("ESA"). 87 Fed. Reg. 80,080–88 (Dec. 29, 2022) ("listing decision").

2.    These plants are incredibly rare, inhabiting only one place in the world: land patches surrounding Arches National Park in Southeastern Utah's Grand and San Juan Counties. As narrow endemic species the Moab-3 have highly specialized habitat requirements, with small populations occupying a miniscule geographic range. All the more impressive is their ability to eke out a living in such a harsh, arid environment, within soils that contain high levels of toxic selenium, by relying on critically timed precipitation.

3.    This rugged terrain is expected to endure particularly brutal changes in its climate, with a scientific consensus that climate change will drive more frequent and more extreme drought, further parching the region in the years to come. These plants' short lifespans, inherently small populations, extremely limited geographic ranges and reliance upon sufficient seasonal precipitation to complete each essential life stage, make the Moab-3 especially vulnerable to extirpation from prolonged droughts.

4.    Plaintiff, WildEarth Guardians ("Guardians"), initially petitioned the Service in 2007 to list these species under the ESA, and the Service responded with a positive 90-day finding in 2009 that listing may be warranted. 74 Fed. Reg. 41,649–41,662 (Aug. 18, 2009) (corrected by the Service on September 14, 2009, 74 Fed. Reg. 46,965–46,966). Thirteen years later, the Service published its "12-month" listing decision finding that listing was "not warranted." 87 Fed. Reg. 80,080–88 (Dec. 29, 2022).

5.    Guardians brings this lawsuit on the grounds that the Service's "not warranted" listing decision ignored and obfuscated climate change impacts as well as other threats to these rare,

endemic plants and their ecosystem, rendering this decision arbitrary, capricious, contrary to the best scientific and commercial data available, and otherwise not in accordance with the ESA. Guardians thus turns to this Court to set aside the Service's 2022 listing decision and remand it to the agency for a new decision that is consistent with governing law.

## JURISDICTION AND VENUE

6.      This action is brought pursuant to the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(C), which waives the Defendants' sovereign immunity. This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 2201 (declaratory judgment), 16 U.S.C. § 1540(c) (actions arising under the ESA), and 16 U.S.C. § 1540(g) (citizen suit provision of the ESA).

7.      This Court has the authority to review the Service's action(s) complained of herein and grant the relief requested, under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 706, and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.

8.      Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because Defendants reside in the district and a substantial part of the events giving rise to Guardians' claims occurred in this district.

9.      Plaintiff has exhausted all available administrative remedies. All requirements for judicial review required by the ESA are satisfied. Guardians mailed a sixty-day notice of intent to sue letter to the Service on October 17, 2024, which was delivered on October 24. This letter notified the Service of Guardians' intent to file a civil action to rectify the legal violations

3

described in the letter. More than sixty days have elapsed since the Service received Guardians'

notice of intent to sue letter for violating the ESA.

## PARTIES

10.    Plaintiff, WILDEARTH GUARDIANS ("Guardians") is a non-profit, 501(c)(3)

conservation organization headquartered in Santa Fe, New Mexico with offices throughout the

Western United States. Guardians' mission is to protect and restore the biodiversity, wild places

and health of the American West. It has over 65,000 active members and supporters nationwide,

including many who reside in Utah. Guardians has an active endangered species protection

campaign, with a geographic focus on flora and fauna endemic to the Western United States. As

part of this campaign, Guardians has repeatedly urged the Secretary to list imperiled species,

including the Moab-3, as threatened or endangered species pursuant to the ESA. Guardians first

filed its petition to list these milkvetches in July 2007. Guardians invested substantial

organizational resources in preparing this petition and in submitting timely comments to the

Service in response to the agency's August 2009 positive 90-day finding.

11.    Guardians brings this action on behalf of itself, its members, and its supporters.

Guardians and its members recreate in or near areas occupied by the Cisco, stage station, and

Isely's milkvetches. Guardians' members and supporters enjoy observing – or attempting to

observe – and studying these milkvetches, including surveying and photographing these rare

plants, particularly when in bloom. The opportunity to search for and view these milkvetches in

the wild is—by itself—of significant interest and value to Guardians' members and supporters and

increases their use and enjoyment of the area.

12. The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, inspirational, educational, spiritual, and botanical preservation interests of Guardians and its members. These are actual, concrete injuries to Guardians, caused by the Service's failure to comply with the ESA and its implementing regulations and policies. These injuries would be redressed by the relief requested in this complaint. Guardians has no other adequate remedy at law.

13. Defendant U.S. FISH AND WILDLIFE SERVICE is an agency of the federal government located within the Department of the Interior. The Secretary of the Interior has delegated to the Service the authority to administer the ESA for terrestrial plants and wildlife. 50 C.F.R. § 402.01(b). The Service is responsible for administering the ESA with respect to the Cisco, stage station, and Isely's milkvetch, including species listing determinations under ESA Section 4.

14. Defendant DOUG BURGUM is sued in his official capacity as Secretary of the United States Department of the Interior. Secretary Burgum is the federal official with overarching responsibility for all Service officials' inactions and/or actions and has the ultimate responsibility for implementation of the ESA.

15. Defendant PAUL SOUZA is sued in his official capacity as the Acting Director of the U.S. Fish and Wildlife Service. Acting Director Souza is responsible for ensuring the Service's decisions comply with the law.

## LEGAL FRAMEWORK

### *Endangered Species Act*

16. In enacting the ESA, Congress recognized that endangered and threatened species are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and

its people." 16 U.S.C. § 1531(a)(3). Accordingly, the ESA seeks "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

17.    To accomplish these goals, Section 4 of the ESA requires the Secretary of the Interior, acting through the Service, to list species determined to be "endangered" or "threatened." 16 U.S.C. § 1533(a).

18.    The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The ESA defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The Service considered the "foreseeable future" for Cisco, stage station, and Isely's milkvetches to be approximately the year 2050.

19.    The ESA broadly defines a "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

20.    The ESA directs the Service to "determine whether any species is an endangered species or a threatened species because of any of the following factors:"

(A)    the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)    overutilization for commercial, recreational, scientific, or educational purposes;

(C)    disease or predation;

(D)    the inadequacy of existing regulatory mechanisms; or

(E)    other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). The ESA requires the Service to list a species if the best scientific and

commercial data available show "that the species meets the definition of an endangered species or

threatened species because of any one or a combination of the [five listing] factors." 50 C.F.R. §

424.11(c).

21.    The Service must make its listing determinations "solely on the basis of the best

scientific and commercial data available." 16 U.S.C. § 1533(b)(l)(A), (c)(2); 50 C.F.R. §§ 424.11(b)

& (d). Under this standard, the Service cannot ignore evidence solely on the ground that it lacks

complete scientific certainty. Even if the best available scientific and commercial data are quite

inconclusive, the Service must still rely on it.

22.    Further, in making listing determinations, the Service may not conflate the

question of whether a species is threatened or endangered "throughout a significant portion of its

range" with the question of whether it is threatened or endangered throughout its entire range.

23.    To ensure the timely protection of species at risk of extinction, Congress set forth a

detailed process whereby citizens may petition the Secretary to list a species as threatened or

endangered. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a). This process includes mandatory

deadlines for the Service to respond to petitions and make final listing determinations. 16 U.S.C.

§§ 1533(b)(3), (5), (6); 50 C.F.R. §§ 424.14(h)(1), (2).

24.    Once a species is listed under the ESA, an array of critical statutory protections apply to

ensure the continued existence of the species as well as provide for its recovery to the point where

its protection under the Act is no longer necessary. For example, Section 7 of the ESA requires all

federal agencies to take affirmative steps to ensure that there is no risk that any of their actions

might "jeopardize the continued existence . . . or result in the destruction or adverse modification of habitat" of any listed species. 16 U.S.C. § 1536(a)(2). To this end, Section 7 requires federal agencies to consult with the Service when their actions may affect a listed species. 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14(a). The purpose of this consultation is to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts. Additionally, the Service may "suggest modifications" to an action during consultation to "avoid the likelihood of adverse effects" to the listed species even when the action would not by itself jeopardize the species' continued existence. 50 C.F.R. § 402.13(b).

25.    Additionally, Section 4(a)(3) requires the Service to designate "critical habitat" for listed species, which are the areas that must be protected to ensure the species survival and recovery. 16 U.S.C. § 1533(a)(3). Finally, Section 4(f) mandates that the Service develop and implement recovery plans for listed species, a roadmap of how the species can eventually be secure from the risk of extinction and removed from the list of threatened and endangered species. 16 U.S.C. § 1533(f).

### Administrative Procedure Act

26.    While the ESA provides for judicial review of a "not warranted" 12-month finding, 16 U.S.C. § 1540(g), the APA generally governs the standard and scope of judicial review. 5 U.S.C. §§ 701–706.

27.    Under the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

28.    An agency's action is arbitrary and capricious if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## BACKGROUND

### *The "Moab-3"*

29.     Cisco milkvetch ("Cisco m."), stage station milkvetch ("stage station m."), and Isely's milkvetch ("Isely's m.") are extraordinarily rare members of the pea family that are endemic to the State of Utah, specifically on lands once inhabited by the Ute Indian Tribes. The stage station m. was historically considered a separate population of Cisco m., but was elevated as a distinct species of its own in 2015. The Service first acknowledged this change in classification in the 2022 Species Status Assessment for these three milkvetch species.

30.     The three species have a life cycle of 3–5 years. Reproduction involves pollination from unknown pollinators, resulting in fruiting legumes that drop directly below the plant and rely on sporadic ideal water conditions to germinate. The species are predominantly found in saltbush, sparsely vegetated habitat, with the exception of the Isely's m. that can also be found in pinyon pine and Utah juniper woodlands at higher elevations. The plants reproduce by seed, and seed germination may occur in either the spring or fall. Flowering in all three species generally occurs March–May. Fruit set can occur as early as late April but typically occurs in late May to mid-June. Seed dispersal is limited, as fruits remain on the plant and split open, depositing seeds at the base of the parent plant. The aboveground portion of the plant dies back after flowering and fruiting each year. Plants are dormant during the winter months.

31.     The plants are predominantly found in selenium rich soils and they are considered selenium hyperaccumulators, making the plants and fruits generally toxic and unappealing to foragers. As a result, the only natural method of seed redistribution is through precipitation events, resulting in highly localized populations that have each managed to remain taxonomically distinct despite existing just 15–25 miles from each other.

32.     Cisco milkvetch was first collected in 1890 at Cisco, Utah "on gravelly soil near the Grand River" (a.k.a. the Colorado River) and described in 1891 by Marcus E. Jones. The first modern collection of Cisco m. was by Stanley Welsh in 1965 east of Thompson Springs in Grand County, Utah. Cisco m. is known for its pale yellowish-white flowers and red stems, the flowers themselves being the largest of the Utah *Astragalus*. Cisco m. habitat includes six tiny populations found north of Arches National Park, nearest to Utah towns Cisco and Thompson Springs. Cisco m. habitat abuts up against numerous active oil and gas wells and a buried oil pipeline within its habitat.



*Cisco milkvetch. Photo by D. Winkler*

33.     Stage station milkvetch was first collected in 1913, by Marcus E. Jones, approximately 16 miles northwest of Moab, Utah near Courthouse Rock. The first modern collection was made by Duane Atwood in 1982. Welsh described stage station m. as a distinct variety of Cisco m.. The stage station variety of Cisco m. is now elevated to the species level. Stage station m. are known to have pink and white flowers that fade to yellow over time. The species is named for the historic stage station located near Courthouse Rock. Stage station m. habitat includes only one population west of Arches National Park and is entirely within a designated Section 368 Energy Corridor.



*Stage station milkvetch. Photo by M.A. Franklin*

34.     Isely's milkvetch was first collected by Per Axel Rydberg in July 1911 in the La Sal Mountains in San Juan County, Utah. Stanley Welsh made the first modern collection of Isely's milkvetch in May 1971 on Brumley Ridge in San Juan County.  Isely's m. is distinguished by its

smaller flowers, particularly whiter than the other two. Isely's m. habitat includes four populations south of the Park, predominantly within and adjacent to the western border of Manti-La Sal National Forest. The large majority of its habitat is within the same designated Section 368 Energy Corridor. Additionally, much of its habitat abuts up against oil wells and uranium mines.



*Isely's milkvetch. Photo by M.A. Franklin*

35.    In its 2022 Species Status Assessment ("SSA"), the Service identified six populations for the Cisco milkvetch: Bread Knolls/Cisco Wash, Cisco Mesa, Thompson Springs East, Thompson Springs West, White House, and Cisco. The Service identified only one population for the stage station milkvetch, aptly named stage station.  The Service identified four populations for the Isely's milkvetch: Kane Springs/Yellow Circle Mines Rd, Onion Creek, Pack Creek/Brumley Ridge, and Shumway Mines.  Collectively, the Service identified eleven populations, with no more locations identified despite numerous surveys to discover more.

12

36.     In the SSA, the Service classified the current condition of Shumway Mines population of Isely's milkvetch as "low," just above extirpated. The Service also classified two populations of the Cisco milkvetch, White House and Cisco, as "low." Within the SSA, the Service assumed the Cisco population of the Cisco m. to still exist despite additional survey efforts failing to detect any plants in the Cisco population since 1985.

### Climate Change Threatens the Continued Existence of these Endemic Plants

37.     The predominant threat to the Moab-3 is climate change. Many of the other threats to the species are compounded by climate change impacts. The Service acknowledges that climate change is expected to have a substantial influence on the future conditions for these milkvetches and negatively impact their entire home ranges. Precipitation is an essential resource needed for all portions of the species' lifecycle. More frequent, extreme drought, as a result of climate change, is expected to increase throughout all the milkvetches' limited ranges. Precipitation has the greatest influence on their abundance and survival as seed germination, seedling establishment and survival, flowering, and reproductive output all depend upon sufficient seasonal precipitation. Life stages of the species including seed germination, seedling emergence, first year seedling growth, flowering, and fruit setting all require adequate spring precipitation. Similarly, seed germination, seedling emergence, and first year seedling growth also require sufficient fall and/or winter precipitation as well. With short lifespans of just 3-5 years, extended droughts threaten to preclude these plants from completing these essential life stages and thus persisting as a species.

38.     In its SSA, the Service developed three climate scenarios for the range of Cisco, stage station, and Isely's milkvetch: Hot and Very Dry Spring, Hot and Very Wet Spring, and Warm and Near Historical Spring Precipitation. These scenarios represent projected changes in climate by the

year 2050 based on the projected conditions averaged over the 30-year period 2040 to 2069 relative to the historical conditions for the period 1971 to 2000. Differences in the amount of spring precipitation drives variability across the three climate scenarios. Specifically, the Service projects that "extreme drought" will increase over the coming years from "none" in the historical period (1971 to 2000) to occurring either three, five, or nine times out of every ten years by 2050, depending on the climate scenario.

39.    The Service incorporated these three climate scenarios into three plausible "future scenarios." The SSA states that these future scenarios attempt to capture the uncertainties regarding climate-related changes to temperature and precipitation trends, as well as uncertainties in future changes to other factors influencing these species. The SSA further explains that the severity of climate change impacts to these three milkvetch species and their ability to persist beyond 2050 will also be influenced by the magnitude of future changes in other key stressors like mineral mining, oil and gas development, land development and conversion, major energy and transportation corridors, recreation, and cover of non-native, invasive plant species.

40.    Future Scenario 1 estimates a five-fold increase in extreme drought occurrences, from none to five out of every ten years. Despite acknowledging that half of each decade would be severely drought-stricken compared to the historic baseline of "none," the Service concluded there will be no change in the condition of any of the eleven milkvetch populations. This is exemplified by comparing the current condition column with the Future Scenario 1 column below.

| Species | Population | Overall Current Condition | Future Scenario 1: Continuation | Future Scenario 2: Low to Moderate Increase in Stressors | Future Scenario 3: Substantial Increase in Stressors |
|---|---|---|---|---|---|
| Cisco Milkvetch | Bread Knolls/Cisco Wash | Medium | Medium | Medium | Low |
| | Cisco Mesa | High | High | Medium | Medium |
| | Thompson Springs East | Medium | Medium | Medium | Low |
| | Thompson Springs West | Medium | Medium | Low | Low |
| | White House | Low | Low | Low | Extirpated |
| | Cisco | Low | Low | Low | Extirpated |
| Stage Station Milkvetch | Stage Station | Medium | Medium | Medium | Low |
| Isely's Milkvetch | Kane Springs/Yellow Circle Mines Rd | Medium | Medium | Low | Low |
| | Onion Creek | Medium | Medium | Medium | Low |
| | Pack Creek/Brumley Ridge | High | High | Medium | Low |
| | Shumway Mines | Low | Low | Low | Low |

*Summary of overall condition scores found in SSA at 85.*

41.    Future Scenario 2, characterized as "Hot and Very Wet Spring," forecasts extreme drought every three in ten years.

42.    Future Scenario 3, characterized as "Hot and Very Dry Spring," forecasts extreme drought every nine years per decade.

43.    Under Future Scenario 3, the Service predicts two of the six populations of Cisco m. will be fully extirpated while another three will be in danger of extirpation, i.e., in "low" condition. All four populations of Isely's m. and the sole population of stage station m. will also be in danger of extirpation in "low" condition under Future Scenario 3.

### Other Key Threats to the Moab-3's Ability to Persist

44.    The highly localized existence of each of the Moab-3 combined with their small population sizes increases their vulnerability to all stressors, in turn making them especially

15

vulnerable to extirpation. In its 2022 SSA, the Service identified other key threats arising from mineral mining, oil and gas development, land development and conversion, energy and transportation corridors, invasive plant species, future wildfires, grazing, and recreation (off-highway vehicles, biking, camping, etc.).

45.    The Service declined to "carry forward" consideration of the threat of wildfire, despite a human-caused wildfire burning through the Pack Creek/Brumley Ridge population of Isley's m. in 2021. The Service reasoned that the selenium filled soils of the species' habitat have historically lacked fine fuels that would carry wildfire, but at the same time identified the proliferation of non-native, invasive plants that increase fuels in the region as a threat to the species.

46.    Many threats identified by the Service spread non-native, invasive plant species, which in turn increases the amount of fine fuels, and ultimately the risk of wildfire in ecosystems not prone to wildfire. The Service identified that non-native, invasive plants spread with anthropogenic disturbances, including oil and gas development, mining, recreation, and grazing. Each of these threats compound to introduce invasive plants such as cheatgrass, that serve as novel forms of fine fuels within this ecosystem. With the onset of frequent extreme drought drying this new fuel, the potential for wildfire increases within an ecosystem maladapted to such.

47.    Each threat will continue to independently impact these species as well. The population of San Juan and Grand Counties, Utah are projected to increase by 52 and 47 percent by 2065 respectively. This large population growth will increase daily demands for all recreational activities above and beyond the estimated five million visitors to the Moab area annually. As an example, off-highway vehicle ("OHV") use continues to grow within occupied habitat for the stage station milkvetch's sole population, with the Labyrinth Rims/Gemini Bridges Special Recreation

Management Area. The Bureau of Land Management ("BLM") had yet to develop a travel

management plan to regulate this expanding activity when the Service drafted the SSA.

48.    Active oil and gas leases impact all six populations of the Cisco milkvetch as well as two

Isely's populations. The areas leased for oil and gas are either BLM-managed public lands or Utah

School and Institutional Trust Lands Administration ("SITLA") lands. The Service characterizes

all Cisco milkvetch populations as "heavily leased." But the Service's SSA did not analyze any

potential for a spill or leak from oil and gas infrastructure. As of December 2018, the BLM placed

the Moab-3 on their Sensitive Plant Species List, which affords the species avoidance and

minimization measures within leasing notices. Nonetheless, the Service projected further

degradation of milkvetch populations when there was a low to moderate increase of oil and gas

development even with no reductions in surface use stipulations.

49.    The Service projects future development on or near milkvetch habitat as the local

human population grows. Part of Isely's milkvetch habitat is already included for residential and

commercial development plans in San Juan County. Along with general development, the Service

acknowledges that expansion of U.S. Highway 191 will go through further expansions including

widening to incorporate more lanes within stage station milkvetch habitat. The BLM has

designated a Section 368 energy corridor straight through Isely's and stage station habitat. Section

368 corridors are preferred locations for future pipelines and electricity transmission

infrastructure.

50.    The Service incorporated the Species Assessment and Listing Priority Assignment Form

("SALP") by reference within the published listing decision. 87 Fed. Reg. at 80,086 (Dec. 29,

2022). The Service drafted its complete listing reasoning within the SALP. Within the SALP, the

Service assumes that future conservation actions will mitigate current levels or reduce future

negative effects from non-climate related stressors (i.e., recreation, oil and gas development, land

development and conversion, mining, energy corridors, and non-native, invasive plants). In other

words, the Service assumed that each of these stressors will result in no increased impacts upon the

species. This, despite the Service projecting expanding human communities, including highway

expansions, increasing recreational demands, Section 368 energy corridor designation, ongoing oil

and gas leasing, shifts in grazing leases, fluctuating mineral markets, and with all of these threats

further spreading non-native, invasive plants.

### *Listing and Petition History*

51.     Cisco m. was identified as a Category 2 candidate species in 1980, meaning that the

Service had information indicating that listing was probably appropriate, but for which sufficient

information was not available to biologically support a proposed rule. 45 Fed. Reg. 82,480 (Dec.

15, 1980).  In 1985, the Service again identified Cisco m. as a Category 2 species defined

differently as taxa for which the Service had information that listing was possibly appropriate, but

conclusive data on biological vulnerability and threats were not available to support a proposed

rule. 50 Fed. Reg. 39,534 (Sept. 27, 1985). In 1993 it was again identified as Category 2, but in

1996 the Service discontinued the designation of Category 2 species. 58 Fed. Reg. 5,1152 (Sept.

30, 1993); 61 Fed. Reg. 7,595–96 (Feb. 28, 1996).

52.     The Service had proposed listing Isely's m. as an endangered species in 1976. 41 Fed.

Reg. 24,523, 24,543 (Proposed Rule, June 16, 1976). The proposed rule was an *en masse* listing

proposal of over 1,700 plant species, refined from the Smithsonian Institution's report presented

to Congress one year after the ratification of the ESA, per the statute. 41 Fed. Reg. 24,524. While

the language of the proposed listing generally applied to all species proposed in the rule, the text stated in part: "At least one of the above five factors threaten each of the identified plant taxa with extinction throughout all or a significant portion of its range. Certain plants proposed herein are of such restricted range or habitat that they qualify despite their locally sufficient numbers." *Id.* That listing did not occur and the species was then identified as a Category 1 candidate in 1980. 45 Fed. Reg. 82,480, 82,490 (Dec. 15, 1980). A Category 1 candidate is defined as taxon for which the Service had sufficient information on hand to support the biological appropriateness of listing, but final rules were delayed due to large numbers of species being considered for listing as well as the need to gather data concerning the environmental and economic impacts of listings and designations of critical habitat. In 1985 Isely's m. was relegated to Category 3c because it was found to be either more abundant or widespread than previously believed and/or not subject to any identifiable threat, making it no longer considered a candidate species.

53.     On July 24, 2007, Forest Guardians, now WildEarth Guardians, submitted a petition to list the Cisco and Isely's milkvetches as threatened or endangered under the ESA. The Service completed a 90-day finding addressing that petition on August 18, 2009, finding that the petition contained substantial information that listing may be warranted, and a 12-month listing decision would follow. 74 Fed. Reg. 41,649–41,662 (corrected by the Service on September 14, 2009, 74 Fed. Reg. 46,965–46,966). The 12-month listing decision was published December 29, 2022, at which time the Service included the stage station m. into the finding that listing as threatened or endangered was not warranted for any of the Moab-3. 87 Fed. Reg. 80,080–88.

54.     As a part of the Service's 12-month listing analysis, the Service first drafted the Species Status Assessment in March 2022 to deliver current science informing the Service's listing

decision, as is Service practice per *USFWS Species Status Assessment Framework* (2016). But, before

drafting and publishing a final 12-month listing decision, the Service then organized a multi-party

Conservation Agreement and Strategy ("CAS") for the Moab-3 in May of 2022. The CAS was

formulated, finalized, and signed by federal, state, and institutional parties within the span of two

months. The Service then prepared a Species Assessment and Listing Priority Assignment Form

("SALP") in September 2022, which contained the in-depth reasoning for declining to list the

species. The SALP heavily relies upon the CAS for mitigating all key threats to the species. The

Service then published its final 12-month "not warranted" listing decision in the Federal Register

incorporating the SALP, CAS, SSA, and other documents by reference. 87 Fed. Reg. at 80,086

(Dec. 29, 2022).

## FIRST CAUSE OF ACTION

**(Violation of the ESA – Arbitrary and capricious finding that the Cisco milkvetch is not
endangered or threatened based on the five threat factors.)**

55.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

56.    Pursuant to section 4(a)(1) of the ESA, the Service is required to determine whether a

species is threatened or endangered because of any of the following factors: (A) the present or

threatened destruction, modification, or curtailment of the species' range; (B) overutilization for

commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the

inadequacy of existing regulatory mechanisms; and (E) other natural or man-made factors affecting

the species' continued existence. 16 U.S.C. §§ 1532(6) & (20), 1533(a)(1); 50 C.F.R. § 424.11(c).

These factors are listed in the disjunctive so any one or combination of them can be sufficient for a

finding that a species qualifies as threatened or endangered.

//

## Count I

### (Unlawful Finding that Cisco Milkvetch Is Not Endangered Throughout Any Significant Portion of Its Range)

57.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

58.     A species is "endangered" if it "is in danger of extinction throughout all *or a significant portion of its range*." 16 U.S.C. § 1532(6) (emphasis added).

59.     The Service failed to adequately analyze and impermissibly dismissed significant threats to the Cisco m. from climate change (e.g., prolonged extreme droughts), inherently small and geographically isolated populations, as well as the cumulative threats of mineral mining, oil and gas development (including potential leaks or spills from oil and gas infrastructure), land development and conversion, energy and transportation corridors, invasive plant species, future wildfires, grazing, and recreation. 16 U.S.C. §§ 1533(a)(1)(A) & (E).

60.     Given climate change is the greatest threat, the Service failed to adequately evaluate whether conservation agreements and existing regulatory mechanisms will sufficiently reduce impacts to the species and its habitat, now and into the foreseeable future. The Service also failed to ensure the adequacy of existing regulatory mechanisms, specifically the CAS, to sufficiently mitigate all threats (habitat loss and degradation from recreation, livestock grazing, oil and gas development, energy and transportation corridors, invasive plants, wildfire, and land development). 16 U.S.C. § 1533(a)(1)(D).

61.     Because the Service failed to adequately analyze these threats, its conclusions were arbitrary, capricious and not based on the best available science in violation of the ESA. 16 U.S.C. §§ 1533(a)(1), (a)(1)(A), (b)(1)(A); 5 U.S.C. § 706(2).

62.    The Service's "significant portion of its range" analysis for the Cisco m. is also unlawful.

63.    The evaluation of whether a portion of the species range is "significant" under the ESA involves a number of variables and factors, including (but not limited to) the size of the area, the percentage of the species' range, its biological and/or ecological importance to the species, unique factors and habitat conditions, its importance for maintaining connectivity amongst subpopulations and facilitating genetic exchange, and whether its loss would result in the loss of a unique or critical function of the species.

64.    First, the Service did not evaluate and consider whether the near-loss of two of the six Cisco m. populations currently in "low" condition represent "significant" portions of the Cisco m. range. 16 U.S.C. § 1532(6).

65.    Second, the Service's significance finding in the final listing decision for Cisco m. directly contradicts its own underlying scientific analysis in the SSA. The SSA acknowledges the essential nature of the Cisco and White House populations that are currently on the brink of extirpation, but then the Service later concludes in its SALP that these populations are not significant, without addressing nor resolving this internal contradiction.

66.    Accordingly, the Service's finding that the Cisco milkvetch is not endangered in a significant portion of its range violates the ESA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## Count II

**(Unlawful Finding that Cisco Milkvetch Is Not Threatened Throughout All or Any Significant Portion of Its Range)**

67.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

68.     Pursuant to the ESA, a species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

69.     Consistent with the plain language of the ESA, even if the Service were correct that stressors are not presently destroying, modifying, or curtailing a significant portion of its range to the extent Cisco m. is "endangered," the plant still warrants listing as "threatened" because the best scientific and commercial data available indicates that existing stressors under the five factors are likely to destroy, modify and curtail significant portions of the species' range in the "foreseeable future," meaning here by approximately 2050.

70.     The Service failed to carefully consider and adequately apply Section 4(a)(1)'s listing factors, and failed to properly apply the significant portion of range analysis, when it concluded Cisco milkvetch was not likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C. § 1532(20); 16 U.S.C. § 1533(a)(1), (a)(1)(A), (b)(1)(A); 5 U.S.C. § 706(2).

## SECOND CAUSE OF ACTION

**(Violation of the ESA – Arbitrary and Capricious Finding That the Stage Station Milkvetch is Not Endangered or Threatened Based on the Five Threat Factors.)**

71.     Plaintiff hereby incorporates all preceding paragraphs.

72.     Pursuant to section 4(a)(1) of the ESA, the Service is required to determine whether a species is threatened or endangered because of any of the five factors previously cited. 16 U.S.C. §§ 1532(6) & (20), 1533(a)(1), 50 C.F.R. § 424.11(c).

//

///

**Count 1**

**(Unlawful Finding that Stage Station Milkvetch Is Not Endangered Throughout All or Any Significant Portion Its Range)**

73.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

74.     The Service failed to adequately analyze and impermissibly dismissed significant threats to the stage station m. including climate change (e.g., prolonged extreme droughts), a solitary small and geographically isolated population, as well as the cumulative threats of land development and conversion, energy and transportation corridors, invasive plant species, and recreation. Because the Service failed to adequately analyze and improperly dismissed these threats, its conclusions were arbitrary, capricious, and not based on the best available science in violation of the ESA. 16 U.S.C. §§ 1533(a)(1)(A) & (E), (b)(1)(A); 5 U.S.C. § 706(2).

75.     Furthermore, the Service failed to adequately evaluate whether conservation agreements, namely the CAS, and existing regulatory mechanisms will sufficiently reduce threats including climate change impacts, recreation, livestock grazing, energy and transportation corridors, invasive plants, and land development. 16 U.S.C. § 1533(a)(1)(D).

76.     The Service's significant portion of range analysis runs contrary to the plain language of the statutory definition "endangered," specifically, "throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The Service only re-analyzed the entire range of the stage station milkvetch, instead of analyzing whether any other portion of the species' range may be significant, thereby neglecting essential analysis required under the ESA.  Accordingly, the Service's finding that the stage station milkvetch is not endangered throughout all or any significant portion of its range violates the ESA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

24

## Count II

### (Unlawful Finding that Stage Station Milkvetch Is Not Threatened Throughout All or Any Significant Portion Its Range)

77.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

78.    Pursuant to the ESA, a species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

79.    Consistent with the plain language of the ESA, even if the Service were correct that stressors are not presently destroying, modifying, or curtailing a significant portion of its range to the extent stage station m. is "endangered," the plant still warrants listing as "threatened" because the best scientific and commercial data available indicates that key stressors under the five factors are "likely" to destroy, modify and curtail significant portions of the species' range in the "foreseeable future."

80.    The Service failed to carefully consider and adequately apply Section 4(a)(1)'s listing factors, and failed to properly apply the significant portion of range analysis, when it concluded stage station milkvetch was not likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C. § 1532(20); 16 U.S.C. §§ 1533(a)(1), (a)(1)(A), (b)(1)(A); 5 U.S.C. § 706(2). Accordingly, the Service's finding that the stage station milkvetch is not threatened throughout all or any significant portion of its range violates the ESA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

//

///

## THIRD CAUSE OF ACTION

**(Violation of the ESA – Arbitrary and Capricious Finding that the Isley's Milkvetch Is Not Threatened Based on the Five Threat Factors.)**

81.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

82.    Pursuant to the ESA, a species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

83.    Isely's m. meets the statutory definition of "threatened" because the best scientific and commercial data available indicates that key stressors under the five factors are "likely" to destroy, modify and curtail significant portions of the species' range in the "foreseeable future."

84.    The Service failed to adequately analyze and impermissibly dismissed significant threats to the Isely's m. from climate change (e.g., prolonged extreme droughts), inherently small and geographically isolated populations, as well as the cumulative threats of mineral mining, oil and gas development (including potential leaks or spills from oil and gas infrastructure), land development and conversion, energy and transportation corridors, invasive plant species, future wildfires, grazing, and recreation. Accordingly, the Service's finding that the Isely's milkvetch is not threatened throughout all or any significant portion of its range violates the ESA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION

**(Violation of the ESA – failure to use the best available science)**

85.    Plaintiff  realleges and incorporates by reference all preceding paragraphs.

86.     Pursuant to section 4(b)(1)(A) of the ESA, 16 U.S.C. § 1533 (b)(1)(A), the Service must make all listing determinations solely on the basis of the best available science.

87.     In making its "not warranted" determination the Service disregarded and ignored the scientific consensus regarding plant abundance and health markers, which currently represents the best available science on plant species viability. The Service's speculation that the Moab-3 populations are viable at less than 1,000 specimens is contrary to the best available science.

88.     The Service relied upon inconsistent and inaccurate population data when assessing population trends of the species, contrary to the best available science mandate. As a result, the Service's conclusions regarding population status are arbitrary, capricious, and not in accordance with the law.

89.     Accordingly, the Service's failure to utilize the best available science when deciding not to list the Cisco, stage station, and Isely's milkvetches violates the ESA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

THEREFORE, Guardians respectfully requests that the Court:

1.     Declare that the Service acted arbitrarily and capriciously and violated the ESA in issuing the 12-Month Finding;

2.     Set aside and remand the 12-Month Finding for further analysis and agency action consistent with this Court's decision;

3.     Award Guardians its reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

4.      Grant Guardians such further and additional relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Jennifer Schwartz*
Jennifer R. Schwartz
Bar No. OR072978
WildEarth Guardians
213 SW Ash St., Suite 202
Portland, OR 97204
Tel: (503) 780-8281
jschwartz@wildearthguardians.org

Carl Bage
Bar No. OR232896
WildEarth Guardians
213 SW Ash St., Suite 202
Portland, OR 97204
Tel: (818) 219-3636
cbage@wildearthguardians.org
(*applicant for Pro Hac Vice status*)

*Attorneys for Plaintiff*